IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| ANTHONY FORT, | ) | |
| | ) | Case No.: 09 C 50237 |
| Plaintiff, | ) | |
| | ) | |
| | ) | Hon. P. Michael Mahoney |
| v. | ) | U.S. Magistrate Judge |
| | ) | |
| MICHAEL J. ASTRUE | ) | |
| Commissioner of Social Security. | ) | |
| | ) | |
| Defendant, | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.      Introduction**

Anthony Fort seeks judicial review of the Social Security Administration

Commissioner's decision to deny his application for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before the

magistrate judge pursuant to the consent of both parties, filed on March 23, 2010. *See* 28 U.S.C.

§ 636(c); Fed. R. Civ. P. 73.

**II.      Administrative Proceedings**

Claimant filed his application for SSI that became effective on May 9, 2007 alleging a

disability onset date of March 17, 2007. (Tr. 80, 95.) The onset date was amended at Claimant's

hearing to April 17, 2007. (Tr. 22.) His application was denied initially and on reconsideration.

(Tr. 35, 44.) Claimant appeared for a hearing before an Administrative Law Judge ("ALJ") on

May 20, 2009. (Tr. 18.) Claimant was accompanied by his attorney and testified at the hearing.

1

(Tr. 20.) The ALJ issued an opinion denying Claimant's claim for disability benefits on July 23, 2009. (Tr. 9-17.) Because the Appeals Council denied Claimant's Request for Review regarding the ALJ's decision, that decision constitutes the final decision of the Commissioner. (Tr. 1.)

## III.    Background

Claimant was born September 30, 1964, making him 42 years old as of the date of his application for SSI. (Tr. 80.) At his hearing, Claimant testified to the following:

He lived with his wife, three daughters, and two sons. (Tr. 21.) His wife does the cooking and cleaning and his children do yard work. (Tr. 23.) Claimant lays down and watches television all day. (Tr. 23.) He has a driver's license but does not drive due to muscle spasms in his leg. (Tr. 24.) Claimant has a state agency worker who assists him four days a week to help Claimant cook, clean, bathe, and run errands when his wife cannot help. (Tr. 25.) He could put on a shirt but had difficulty with pants and shoes. (Tr. 25.) Claimant is unable to lift anything more than a gallon of milk. (Tr. 25.)

Claimant has a GED. (Tr. 25.) His past work includes construction and heavy lifting jobs such as moving furniture in a retail store. (Tr. 25-26.) In 1999, Claimant had a back surgery as the result of a work-related injury that was settled with his employer. (Tr. 26.) Between 2000 and February of 2006, Claimant was incarcerated for aggravated battery. (Tr. 26-27.) While incarcerated, Claimant was limited to sweeping hallways because of his back problems. (Tr. 27.) After February 2006, Claimant resumed working as an auto salesman. (Tr. 27.) He then switched jobs to begin building trusses for houses for six months. (Tr. 27.) Claimant worked at another furniture store for approximately six months, and then returned to

the job building trusses.  (Tr. 27-28.)

Claimant was injured around June 2007 while working at the job building trusses.  (Tr. 27.)  He had a second surgery performed on his back but obtained no relief from the surgery. (Tr. 28.)  A subsequent MRI revealed that more discs needed to be fused so Claimant underwent a third surgery in February 2008.  (Tr. 29.)  His doctors informed him after the third surgery that they cannot perform any more surgeries.  (Tr. 29.)

Claimant has fused discs between L1 and L5 vertebrae.  (Tr. 22.)  He described a constant burning pain down his legs, pain in his back, back problems, and muscle spasms.  (Tr. 22.)  The third surgery helped somewhat, but he still experiences numbness, burning, and tingling pain in both legs and in his back.  (Tr. 22.)  Claimant's spasms involve muscles tightening up and causing pain.  (Tr. 23.)  He takes Norco for the pain and Soma for the muscle spasms.  (Tr. 23.)  He has to alternate sitting and laying down but does not get good comfort. (Tr. 23.)  Claimant also sweats a lot as a result of his medications.  (Tr. 23-24.)

## IV.    Medical Evidence

Claimant visited the emergency room of Swedish American Hospital on May 2, 2007 complaining of back pain that radiated down his left leg.  (Tr. 146.)  Claimant was able to do a straight leg raise with both legs and hold against resistance, but complained of low back pain while doing so.  (Tr. 147.)  He was given Valium and an injection of Toradol, and told to follow-up with his other providers.  (Tr. 147.)

On May 7, 2007, Claimant saw Dr. Edward S. Lee at OSF Medical Group for lumbar pain and numbness.  (Tr. 155.)  He underwent an MRI on May 11, 2007 which revealed some enhancing scar tissue since Claimant's last MRI on July 24, 2006.  (Tr. 156.)  The MRI revealed

disc herniation at L2-L3 and canal stenosis at L2-L3, L3-L4, L4-L5, and L5-S1 with a moderate-sized right paracentral disc herniation at L5-S1.  (Tr. 156.)  Claimant was referred to Dr. Crute, a neurosurgeon, at a follow-up appointment regarding the MRI results on May 15, 2007.  (Tr. 154.)

Claimant saw Dr. Crute on May 24, 2007.  (Tr. 266.)  Dr. Crute noted Claimant's history of back and leg pain and performed a complete review of Claimant's systems with a physical examination.  (Tr. 266-67.)  Dr. Crute found that Claimant had multilevel lumbar stenosis that was moderately severe and unrelieved by multiple conservative modalities such as epidural steroid injections, narcotic analgesics, rest, and reduced activities.  (Tr. 268.)  Dr. Crute also noted Claimant had a history of hypertension.  (Tr. 268.)  Dr. Crute recommended that Claimant undergo a lumbar decompression surgery.  (Tr. 268.)  Claimant had a preoperative evaluation on June 13, 2007, at which time he was advised to follow-up with Dr. Lee regarding his high blood glucose levels and family history of diabetes.  (Tr. 265.)

Prior to the operation, Dr. Crute found Claimant to have severe multilevel lumbar stenosis with large herniated discs at L2-3, L4-5, and L5-S1 and moderate scarring at L4-5 and L5-S1.  (Tr. 178.) On June 14, 2007, Claimant underwent a decompressive lumbar laminectomy, T12-L1 through L5-S1; foraminotomies, L1-2 through L5-S1; diskectomy, L2-3; redo diskectomy at L4-5; and redo diskectomy at L5-S1.  (Tr. 178.)  Claimant's postoperative diagnosis was lumbar stenosis, L1-S1; lumbar herniated discs, L2-3, L4-5, and L5-S1; and previous surgery at L4-5 and L5-S1.  (Tr. 178.)  Claimant was discharged on June 18, 2007 with instructions to follow-up in the clinic.  (Tr. 174.)

Claimant met with Dr. Crute on July 23, 2007 for a follow-up regarding his recent

surgery. (Tr. 186.) Dr. Crute noted that Claimant stated that he had done relatively well with improved sensation in his feet that had become intermittent. (Tr. 186.) Claimant reported some intermittent burning in his left thigh, considerable incision pain, and swelling with muscle spasms since his surgery. (Tr. 186.) Dr. Crute noted that Claimant had been reluctant to take medication, and was only taking ibuprofin. (Tr. 186.) Notes indicate that Claimant requested permission to return to work, but Dr. Crute advised that he could only return to light duty. (Tr. 187.) Claimant was also advised that he should not drive or sit in a car for more than 30 minutes at a time, but that he could ride in a vehicle that would allow him to move about or lay down. (Tr. 187.)

On July 23, 2007, Dr. William Conroy, M.D., filled out a physical residual functional capacity ("RFC") assessment on behalf of the State Agency based on his review of Claimant's medical records. (Tr. 160-68.) Dr. Conroy noted Claimant's history of back issues and surgeries. (Tr. 167.) His assessment focused on whether Claimant would be able to work within 12 months of his onset date, or by June 14, 2008. (Tr. 160.) Dr. Conroy found that in the future Claimant would be able to occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for about 6 hours in an 8-hour workday, and would be unlimited in his ability to push or pull (including the operation of hand and/or foot controls). (Tr. 161.) Dr. Conroy indicated that Claimant would have no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 165.) Dr. Conroy opined that Claimant should be able to resume activities within the capacity of the RFC assessment by June 14, 2008. (Tr. 167.)

Claimant had a follow-up appointment with Dr. Crute on August 27, 2007. (Tr. 257.) He

reported that he had not filled a prescription for Percocet and was taking only ibuprofin. (Tr. 257.) Claimant reported some improvement since his last visit. (Tr. 257.) Dr. Crute prescribed Flexeril as a muscle relaxant and suggested that Claimant try physical therapy. (Tr. 258.) Notes from a September 24, 2007 follow-up visit indicated that Claimant experienced burning pain and hyperesthesia in his left leg that worsened as Claimant laid on his back along with palpable muscle spasms in the paraspinal lumbar muscles. (Tr. 189.)

On November 8, 2008, Dr. Crute signed a release form indicating that Claimant could return to sedentary work, with no lifting greater than 10 pounds and no bending or twisting. (Tr. 334.) Notes from a November 18, 2007 appointment show that Dr. Crute wished to obtain an MRI of Claimant's lumbar spine based on reports that he would get "charleyhorses" when attempting to perform therapeutic stretching. (Tr. 191.) Claimant reported continued difficulty with low back pain, muscle spasms, and burning pain in his left thigh at a follow-up with Dr. Crute on November 24, 2007. (Tr. 189.) Claimant reported that he had been unable to perform his job duties due to pain he was experiencing. (Tr. 189.)

Claimant underwent an MRI of his lumbar spine on December 10, 2007. (Tr. 181.) Dr. Crute found no change in the degenerative disc disease, which was most severe at the L5-S1 level. (Tr. 181.) Dr. Crute's impression was that there were extensive postsurgical changes of the posterior lumbar laminectomy and increased patency of the central canal. (Tr. 181.) She noted that there was persistent disc protrusion and herniation at L2-L3 and a multi-level epidural scar. (Tr. 181.)

On February 6, 2008, Claimant underwent a lumbar CT scan to compare with his 2007 MRI. (Tr. 281.) Dr. Crute noted that Claimant reported muscle spasms in both legs. (Tr. 311.)

The CT scan showed no change in the lumbar alignment, with continued grade 1 spondylolisthesis at LS-S1; endplate sclerosis at the LS-S1 related to degenerative disc disease; no compression fractures; multilevel degenerative facet arthritis; extensive lumbar laminectomy extending from T12-Ll through L5-S1 levels; multilevel neural foraminal narrowing and osteophytes extending dorsally into the epidural space; soft tissue changes at the lumbar levels; and central canal stenosis with contribution from the spondylolisthesis a tthe L5-S1 levels. (Tr. 281.) Dr. Crute noted extensive postsurgical changes in the lumbar spine with redemonstration of sizeable central disc protrusion at the L2-L3 level. (Tr. 281.)

Dr. Crute performed a posterior lumbar decompression and fusion with pedicle screw fixation between the L2 and S1 levels on Claimant on February 7, 2008. (Tr. 238, 241.) Claimant was able to gradually ambulate using a brace and was discharged with instructions to follow-up in a month. (Tr. 241.) Claimant followed-up on March 17, 2008, where Dr. Crute noted that Claimant had significant stiffness in his back, but that he felt much better since the surgery. (Tr. 239.) Claimant also reported significant muscle spasms in both legs with aching and burning in his thigh and buttock. (Tr. 239.) Claimant's motor strength was 5/5 except where he registered a 4/5 in the right quadriceps, which was largely due to pain. (Tr. 239.) Claimant was found to be doing well postoperatively. (Tr. 239.)

On April 1, 2008, Claimant contacted Dr. Crute's office to inquire about Dr. Crute filling out forms so that Claimant could get services. (Tr. 381.) Claimant was told that he had already requested this and was told it was inappropriate for him to receive the types of services requested. (Tr. 381.) Claimant attempted to arrange for someone from the Illinois Division of Rehabilitation Services ("DORS") to speak with Dr. Crute in early April. (Tr. 382.) On April

11, 2008, Claimant came into the clinic looking for copies of records and to speak with someone about a form that Dr. Crute denied. (Tr. 380.) Claimant called and visited the clinic again on April 22nd and 23rd trying to get a less expensive replacement for his prescription pain medication, Oxycontin. (Tr. 377-78.) Claimant contacted Dr. Crute's office on a number of occasions in May of 2008 looking for modifications to his back brace or lumbar support cushions. (Tr. 375-76.) On June 26, 2008, Claimant called Dr. Crute's office to state that his prescription for Norco was not strong enough and he was taking four at a time. (Tr. 374.) Between July 31, 2008 and August 11, 2008, Dr. Crute's office communicated with a pharmacy regarding multiple prescription denials based on Claimant's attempts to refill Norco prescriptions. (Tr. 372.)

Claimant visited Dr. Crute's office for a follow-up on August 11, 2008. (Tr. 394.) Claimant continued to use his brace all the time, despite being told he could begin to wean the brace. (Tr. 394.) Claimant reported increasing pain, numbness in his buttocks, and stabbing pain in his right thigh if he removed the brace. (Tr. 394.) He remained unable to sit, stand, or walk for long periods of time due to ongoing discomfort, but was otherwise doing quite well. (Tr. 394.) Dr. Crute's office also filled out a prescription note indicating that Claimant had difficulties with ongoing pain and is unable to work at his usual employment. (Tr. 325.) Dr. Crute noted that Claimant had an excellent radiographic and good clinical outcome to date, urged him to wean off of his brace and narcotic medication. (Tr. 395.) Dr. Crute noted some difficulties with multiple prescribers for narcotics, and asked Claimant to get all of his narcotic refills from one physician, as her office would provide him with no further narcotics prescriptions. (Tr. 395.) He was to return in two months. (Tr. 395.)

8

**V.      Standard of Review**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the

proceeding for rehearing or hearing of additional evidence.  42 U.S.C. § 405(g).  The ALJ's legal

conclusions are reviewed de novo.  *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997).

However, the court "may not decide the facts anew, reweigh the evidence or substitute its own

judgment for that of the [ALJ]."  *Id.*  The duties to weigh the evidence, resolve material conflicts,

make independent findings of fact, and decide the case are entrusted to the Commissioner.

*Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows

reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for

that decision falls on the Commissioner.").  The court may remand to the Commissioner where

there is a showing that there is new evidence which is material and that there is good cause for

the failure to incorporate such evidence into the record in a prior proceeding.  42 U.S.C. §

405(g).

If the Commissioner's decision is supported by substantial evidence, it is conclusive and

this court must affirm.  42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th

Cir. 2002).  "Substantial evidence" is "evidence which a reasonable mind would accept as

adequate to support a conclusion."  *Binion*, 108 F.3d at 782.  If the ALJ identifies supporting

evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the

ALJ's findings are supported by substantial evidence.  *Haynes v. Barnhart*, 416 F.3d 621, 626

(7th Cir. 2005).  However, if the ALJ's decision "lacks evidentiary support or is so poorly

articulated as to prevent meaningful review, the case must be remanded."  *Steele v. Barnhart*,

9

290 F.3d 936, 940 (7th Cir. 2002).

## VI.    Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.  The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors.  The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

## VI.    Discussion

## A.    Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  Substantial gainful activity is work that

10

involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ noted that Claimant worked after the alleged onset date, but found that the work activity was not at the substantial gainful activity level. The ALJ held Claimant had not engaged in substantial gainful activitiy since May 9, 2007. (Tr. 11.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

**B.      Step Two: Does the Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 416.920(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that Claimant has the following severe impairments: back problems, four ruptured discs, post laminectomy, and three back surgeries. (Tr. 11.) Claimant was also found to have non-severe impairments of a lump in his right breast, hypertension which is well controlled, headaches, and obesity. (Tr. 11.) The ALJ found that none of the non-severe impairments would cause more than minimal limitations in Claimant's ability to perform basic work activity. (Tr. 11.) The substantial evidence in the record supports the conclusion that Claimant had one or more severe impairments, and the

11

parties do not dispute this determination. Therefore, the ALJ's Step Two determination is affirmed.

### C.     Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. § 416.925(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 12.) The ALJ specifically considered whether Claimant's back problems met the requirements of Listing 1.04A. Neither party challenged the ALJ's findings at Step Three, so the court will affirm the ALJ's determination.

### D.     Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional

capacity is a measure of the abilities which the claimant retains despite his or her impairment.

20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence,

including objective medical evidence, treatment, physicians' opinions and observations, and the

claimant's own statements about his limitations. *Id.* Although medical opinions bear strongly

upon the determination of RFC, they are not conclusive; the determination is left to the

Commissioner who must resolve any discrepancies in the evidence and base a decision upon the

record as a whole. 20 C.F.R. § 416.927(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir.

1995).

When assessing the credibility of a claimant's statements about his or her symptoms,

including pain, the ALJ should consider the following in addition to the objective medical

evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity

of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the

symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the

claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than

medication, the claimant receives or has received for relief of pain or other symptoms; (6) any

measures other than treatment the claimant uses or has used to relieve pain or other symptoms;

and (7) any other factors concerning the claimant's functional limitations and restrictions due to

pain or other symptoms. Social Security Ruling 96-7p; *see* 20 C.F.R. § 416.929(c).

Past relevant work is work previously performed by the claimant that constituted

substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R.

§ 416.965(a); Soc. Sec. Rul. 82-62. If the claimant's RFC allows him to return to past relevant

work, the claimant will not be found disabled; if the claimant is not able to return to past relevant

work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ determined that Claimant had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 916.967(a). (Tr. 12.) In making his RFC determination, the ALJ indicated he considered all of Claimant's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the medical evidence and other evidence, based on the requirements of 20 C.F.R. § 416.929 and SSRs 96-4p and 96-7p. (Tr. 12.) The ALJ stated he also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (Tr. 12.)

The ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (Tr. 16.) The ALJ then had to consider the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities. Where statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by medical evidence, a finding is made on the credibility of the statements based on a consideration of the entire record. The ALJ found Claimant's statements concerning intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the assessed RFC. (Tr. 16.)

Based on his RFC finding, the ALJ held that Claimant was unable to perform any past relevant work. (Tr. 16.) Claimant's past relevant work was as a warehouse worker and general laborer, which are considered medium to heavy work. (Tr. 16.) The parties do not challenge the ALJ's Step Four finding, and the court affirms. Because the ALJ decision was based on a Step

Five finding, the court will discuss the ALJ's support for his RFC finding in more detail at Step Five.

**E.      Step Five: Does Any Other Work Exist in Significant Numbers in the National Economy Which Accommodates the Claimant's Residual Functional Capacity and Vocational Factors**?

At step five, the Commissioner determines whether the Claimant's RFC and vocational factors allow the Claimant to perform any job which exists in the national economy in significant numbers. 20 C.F.R. § 416.960(c). The burden is on the Commissioner to provide evidence demonstrating other work exists. 20 C.F.R. § 416.960(c)(2). In doing so, the Commissioner considers the Claimant's RFC and vocational factors in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2 (the "Guidelines").

The Guidelines direct a conclusion of "disabled" or "not disabled" upon a finding of a specific vocational profile. Soc. Sec. Rul. 83-11.  The Guidelines represent exertional maximums, and if the Claimant cannot perform substantially all of the exertional demands contemplated by the Guidelines and/or has non-exertional limitations, the medical-vocational rules are used as a framework for decision making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or exertional limitations. Soc. Sec. Rul. 83-12; 83-14.  The ALJ found that Claimant could perform all of the exertional demands of sedentary work.  (Tr. 12.)  Based on Claimant's age, education, and work experience, the ALJ found that Rule 201.27 directed a finding of "not disabled."

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  20 C.F.R. 404.1567(a).  A

sedentary job is defined as one which involves sitting, though a certain amount of walking and standing is often necessary in carrying out job duties. *Id.* Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *Id.*

Claimant argues the ALJ improperly discounted Claimant's subjective descriptions of his pain, and therefore erroneously arrived at an RFC. A claimant's testimony regarding the intensity or persistence of pain should not be disregarded solely because there is no objective medical evidence supporting the same. SSR 97-7p. Claimant correctly notes that the ALJ must give reasons for finding a Claimant's subjective complaints to be not credible. *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2004).

The ALJ composed a detailed recitation of Claimant's medical history. (Tr. 12-16.) The ALJ indicated that he based his RFC findings in large part on the opinions of Dr. Crute, Claimant's treating physician. Significant weight was also given to the opinions of Claimant's non-treating physicians, including Dr. Conroy, Dr. Lee, and Dr. Tovar. (Tr. 16.) The ALJ highlighted the fact that Dr. Crute released Claimant to resume sedentary work in November of 2007, though Dr. Crute restricted Claimant from lifting more than ten pounds or engaging in any bending or twisting.

The ALJ's blanket statement that he relied on Claimant's treating and examining physicians does not automatically create a logical bridge between the evidence in the record and the ALJ's RFC determination. Quite the contrary, the ALJ appears to have selectively emphasized certain opinions without regard for subsequent medical findings or opinions.

Regarding the opinions of Dr. Tovar and Dr. Lee, it is unclear how their opinions are helpful in determining Claimant's RFC. Reflecting the medical record, the ALJ opinion only

16

mentions Dr. Tovar to the extent that he was the attending physician when Claimant was admitted to the emergency room in May 2007. Dr. Tovar gave Claimant an injection of Toradol and Valium, diagnosed him with low back pain or sciatica, and instructed him to follow-up with his regular providers. (Tr. 146.) Claimant saw Dr. Lee a few days later, and Dr. Lee found Claimant to have lumbar disc herniation and lumbar radiculopathy. Dr. Lee referred Claimant to Dr. Crute. (Tr. 154.) Dr. Tovar and Dr. Lee both offered opinions prior to Claimant's two most recent surgeries, and their opinions are most significant for the suggestion that Claimant needed to see a specialist.

That leaves Dr. Conroy and Dr. Crute as the two medical physicians upon which the ALJ says he relied. Dr. Conroy, the state agency examining physician, opined on July 23, 2007 that Claimant's treatment had been conservative and that Claimant would be able to resume activities within the RFC assessment within twelve months. The ALJ's reliance on Dr. Conroy's evaluation presents a number of problems. First, Dr. Conroy's RFC assessment appears to contradict itself when it states that Claimant had undergone two back surgeries, including one less than a month prior, while at the same time stating that Claimant had been receiving conservative treatment for his back pain. (Tr. 167.) Second, Dr. Conroy found that Claimant would be able to occasionally lift 50 pounds; frequently lift 25 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; would be unlimited in his ability to push or pull (including the operation of hand and/or foot controls); and would have no postural, manipulative, visual, communicative, or environmental limitations by June of 2008. (Tr. 161-65.) While Dr. Conroy's very optimistic RFC may have had some significance at the time, it turned out that Claimant ended up needing a

17

third back surgery within seven months. The RFC issued by Dr. Conroy is inconsistent with more recent findings by Dr. Crute and with the ALJ's own RFC findings. It is also inconsistent with Claimant's subsequent treatment as evidenced in the medical record. The ALJ did not explain the inconsistencies within Dr. Conroy's opinion or between his RFC and Claimant's subsequent treatment.

As to Dr. Crute, the ALJ appears to have emphasized opinions from the period of time before Claimant's third back surgery. The ALJ's opinion specifically alluded to a form Dr. Crute filled out on November 8, 2007 indicating that Claimant could return to sedentary work. The opinion does not discuss the fact that by November 18, 2007, Dr. Crute wanted Claimant to undergo an MRI of his lumbar spine, and by November 24, 2007, Claimant reported to Dr. Crute that he was unable to perform his job duties. (Tr. 189.) By February 6, 2008, Claimant had undergone an MRI and a lumbar CT scan, and Dr. Crute noted extensive postsurgical changes in the lumbar spine with redemonstration of sizeable central disc protrusion at the L2-L3 level. (Tr. 281.) This led to a third surgery on February 7, 2008, where Dr. Crute performed a posterior lumbar decompression and fusion with pedicle screw fixation between the L2 and S1 levels. (Tr. 238, 241.) Claimant was able to gradually ambulate using a brace and was discharged on February 11, 2008. (Tr. 241.) By August 11, 2008, Dr. Crute's notes state that Claimant reported being unable to sit, stand, or walk for long periods of time due to ongoing discomfort, and Dr. Crute's office filled out a prescription note indicating that Claimant had difficulties with ongoing pain and was unable to work at his usual employment. (Tr. 325, 395.)

The court finds the ALJ's reliance on select 2007 medical records from Dr. Conroy and Dr. Crute to be unsupported by the medical record as a whole. Claimant underwent a significant

18

back surgery in February 2008, but the ALJ failed to analyze any information from Claimant's medical record after September of 2007.  This error is significant, as the ALJ is charged with resolving any discrepancies in the evidence and must base his decision upon the record as a whole.  20 C.F.R. § 416.927(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

Regarding the credibility of Claimant's statements about intensity, persistence, or pace, the ALJ partially relied on objective medical evidence that was in contrast with Claimant's statements.  The ALJ opinion states that there is "no objective medical evidence supporting [Claimant's] claims of a total disability."  (Tr. 16.)  Based on the aforementioned discussion of the medical record, the court finds that the ALJ's statement lacks evidentiary support and does not allow for meaningful review of his credibility analysis.  *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  The ALJ opinion also states that Dr. Crute never placed any additional restrictions on the Claimant after November 2007.  Again, this appears to be in contrast to the evidence that Claimant underwent a third surgery and was observed to have significant ongoing pain and difficulty sitting, standing, or walking for long periods of time.  Dr. Crute was not asked to fill out an up-to-date RFC form, nor was a medical expert present at Claimant's hearing to evaluate Claimant's entire medical record.

The ALJ also seems to have related Claimant's testimony about having a DORS worker to Claimant's credibility.  The opinion states that there is no evidence in the record regarding Claimant's use of a DORS worker, "or who requested the DORS worker, or why they were requested."  (Tr. 16.)  It is unclear why it would matter who requested Claimant's DORS worker and why.  To the extent it is relevant, there is no evidence in the record that contradicts Claimant's statement.  The ALJ's discussion of Claimant's credibility does not allow for

19

meaningful review.

The court finds that the ALJ failed to build a logical bridge between the medical record as a whole and his conclusion. In particular, there is substantial evidence suggesting that the information highlighted by the ALJ was not current, and did not encompass all of Claimant's symptoms and treatment history. In addition, the ALJ's cursory explanation regarding Claimant's credibility does not allow for meaningful review.

The ALJ's Step Five finding is not supported by substantial evidence, and is therefore reversed and remanded for further proceedings consistent with this Order. On remand, it may be useful for the ALJ to obtain an updated RFC from Claimant's treating physician or a consulting medical expert.

**VII.    Conclusion**

For the forgoing reasons, Claimant's motion for summary judgment is granted, and the Commissioner's motion for summary judgment is denied. This matter is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) with instructions that the Commissioner conduct further administrative proceedings in accordance with this opinion.


**E N T E R:**

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**


**DATE**: March 12, 2012

20